IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02756-KLM

WARREN CRAIG AUSTIN,

     Plaintiff,

v.

UNITED STATES OF AMERICA,

     Defendant.
_____

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
_____

     This matter came before the Court for trial on June 18-20, 2018.[1]  At the conclusion

of trial, the Court took the matter under advisement.  Having fully reviewed the evidence

presented, applicable law and arguments of counsel, the Court now enters its Findings of

Fact, Conclusions of Law and Order.

## I.  Case Background

     Plaintiff was injured on January 11, 2014 in Lakewood, Colorado, when a United

States Postal Service delivery vehicle collided with the car he was driving.  Plaintiff brought

suit for damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, and 2680.

*Compl.* [#1] ¶ 3.  Defendant does not contest liability for the accident, but does contest

damages.

     Plaintiff was 56 years old at the time of the accident, and sustained injuries to his

_____

[1]   Pursuant to 28 U.S.C. § 636(c), the matter has been referred to the undersigned for all
purposes, including trial and final judgment.  *See* [#15, #16].  "[#15]" is an example of the
convention the Court uses to identify the docket number assigned to a specific paper by the Court's
case management and electronic case filing system (CM/ECF).  This convention is used throughout
this Order.

cervical spine as a result of it. Plaintiff's injuries manifested primarily in swelling of his C3-C4 facet joint and pain on both sides of his neck and in his left shoulder. He underwent five months of physical therapy treatment for his injuries and was discharged from physical therapy because he met his functional goals, which included improving his ability to manage pain that interfered with his daily living activities, managing his headaches, performing personal care activities, increasing the range of motion in his neck and improving his strength in the cervical region. Exh. 19 at 110. Nevertheless, Plaintiff continued to experience pain and problems with neck rotation and felt he had exhausted the benefits of physical therapy. He believed that he had not reached his "real goal," which was to "get rid of the pain altogether." Plaintiff's treating physician, Jason Friedrich, M.D., concurred that additional physical therapy visits would not significantly change Plaintiff's outcome, because Plaintiff had "plateaued" with respect to that treatment.

After an MRI examination of Plaintiff's neck and spine in September of 2014, Dr. Friedrich recommended that Plaintiff undergo a procedure known as a rhizotomy, which involves steroid injections into the spinal column. As of the time of trial, Plaintiff had undergone three rhizotomies, which resulted in substantial alleviation of the pain in the left side of his neck as well as other symptoms. Dr. Friedrich testified that after a rhizotomy, Plaintiff is happy with how his neck feels over the next six months, then tolerates the pain for as long as he can before undergoing the procedure again. Dr. Friedrich opined that Plaintiff will need to undergo periodic rhizotomies indefinitely in order to continue to manage his left-sided neck pain and other symptoms.

After his first rhizotomy, Plaintiff also began to receive epidural steroid injections for pain in the right side of his neck. The injections afford him some relief. Dr. Friedrich testified

that there is more than a 50% chance that Plaintiff's right-sided neck pain was also caused by the accident. Dr. Friedrich further stated that Plaintiff will experience pain from swelling in his C3-C4 facet joint as a result of the accident indefinitely, and expects Plaintiff to require rhizotomies and epidural steroid injections once or twice each year. Plaintiff is prescribed three medications for pain relief as well as an anti-inflammatory drug. As of the date of trial, the billed cost of Plaintiff's rhizotomies and injections was approximately $28,000. Exhs. 13.4, 13.5.

Plaintiff served in the United States Air Force from June 15, 1975 until his retirement from service in May of 1998. He worked as the Manager of Safety at Denver Water at the time of the accident. He had intended to work to age 62, but instead retired at age 59 because he believed the pain medications he was taking affected his ability to do his work. He testified that it was more difficult for him to concentrate with headaches and pain and he did not want to make a mistake, so he retired. He admitted that the opportunity to spend more time with his family was also a reason why he decided to retire. He lost wages in the amount of $100,000 per year for three years as a result of his early retirement, as well as an annual employer 401(k) matching payment in the amount of $3,000. He has not sought other employment since he retired.

In addition, Plaintiff's medical expenses related to the accident to the date of trial totaled $59,418.64. Exh. 13.2. He continues to experience some pain and soreness and has limited ability to turn his head and to reach overhead and outward with his left arm. He believes that he cannot undertake activities he once enjoyed, like golf and biking, because he may re-injure his neck. He testified that he put restrictions on himself because of his fear of suffering more injury, and admitted that no medical provider has told him that he

must stop playing golf or engaging in other activities.

Plaintiff had been experiencing chronic shoulder pain for approximately ten years prior to the accident. Dr. Friedrich admitted that not all of Plaintiff's left shoulder pain resulted from the accident, and that Plaintiff also had substantial disc degeneration in his spine prior to the accident. There is no evidence that the accident caused Plaintiff's disc degeneration, which preceded the date of the accident. In addition, according to Plaintiff's medical records, he reported to medical personnel that he fell sometime between June and August of 2014 due to low blood pressure, but he does not recall reporting the fall to his physician. Exh. C at 193, 208. He testified that the only "falling" incident he can recall relates to trying to get up from the floor of his family room, feeling dizzy, and sitting back down. At Dr. Friedrich's trial testimony preservation deposition taken about five weeks before trial, he stated that he was unaware of Plaintiff's fall history and did not consider it in formulating his opinions about the cause of Plaintiff's injuries and pain.

Defendant's expert witness, L. Barton Goldman, M.D., reviewed Plaintiff's medical records and conducted an independent medical examination of Plaintiff. According to Dr. Goldman, the injuries suffered by Plaintiff as a result of the accident were most likely to soft tissue and from bruising. Dr. Goldman noted that Plaintiff had several pre-existing conditions, including left rotator cuff strain with atypical impingement of his shoulder, low back and neck pain, degenerative disc disease and high blood pressure. In Dr. Goldman's opinion, the fluid apparent in Plaintiff's facet joints in the September 2014 MRI exam was consistent with degenerative disc disease, not trauma. Dr. Goldman further noted that based on Plaintiff's medical records, he was doing "very well" by the summer of 2014. Exhs. D-2, D-3. At that time Plaintiff reported that he was feeling between 85% and 95%

better, reflecting considerable improvement within five months of the accident.  However, Plaintiff regressed after the date when the falling episode was noted in his medical records. Dr. Goldman believes that Plaintiff's regression in improvement coincided with the fall, and that it played "an aggravating role" in terms of Plaintiff's chronic pain.  Dr. Goldman further opined that with continued physical therapy, Plaintiff could "return to baseline" in terms of his physical condition within 3 to 6 months.  He stated that less-expensive treatments are available to treat Plaintiff's injuries, like targeted physical therapy, myofacial interventions, massage therapy, acupuncture and trigger-point injections. Dr. Goldman estimated the cost of his recommended treatment regimen at $7,500 to $8,500 annually. He also opined that Plaintiff "will never be back to 100%," but will experience some chronic pain for the rest of his life, further explaining that Plaintiff will experience "waxing and waning pain" with overhead reaching and stretching.  Dr. Goldman projected, however, that Plaintiff would have minimal permanent physical impairment with adequate treatment.

Plaintiff's medical expenses were paid through TRICARE, a managed health care program that provides health benefits to military personnel.  Plaintiff is seeking damages for economic losses, past and future non-economic losses (emotional pain,  physical pain and inconvenience) and physical impairment.

## II.  Findings of Fact and Conclusions of Law

### A.    Damages

As noted above, Plaintiff seeks three categories of damages: economic losses, including medical expenses, non-economic losses, and damages for physical impairment. *See generally Pringle v. Valdez*, 171 P.3d 624, 629 (Colo. 2007).  The Court addresses each category of damages separately below.

Plaintiff must prove his entitlement to damages by a preponderance of the evidence. Colo. Rev. Stat. § 13–25–127 (West); *Nelson v. United States,* No. 11-cv-02953-WYD-MEH, 2014 WL 1929585, at *13-14 (D. Colo. May 14, 2014); s*ee also Perkins v. Fed. Fruit & Produce Co., Inc.*, No. 11-cv-00542-JAP-KLM, 2013 WL 5981719, at *2 (D. Colo. Nov. 12, 2013) (explaining proof of lost wages by a preponderance of evidence). Plaintiff must also show that his damages were caused by the collision which occurred on January 11, 2014. *McLaughlin v. BNSF Ry. Co.,* 300 P.3d 925, 935 (Colo. App. 2012). Finally, he "may not recover damages for injuries that might reasonably have been avoided," because he has the duty to take reasonable steps under the circumstances to mitigate the damages he sustained. *Banning v. Prester*, 317 P.3d 1284, 1287-88 (Colo. App. 2012) (citing *Harsh v. Cure Feeders, LLC*, 116 P.3d 1286, 1288 (Colo. App. 2005)).

### 1.    Economic Losses, Including Medical Expenses

### (a)    Property Damage

Plaintiff presented evidence that the cost of repairing the damage to his vehicle from the accident was estimated at $4,795.80 to $9,324.15. Exhs. 8, 9. The average of those figures is $7,059.98, which the Court finds is a reasonable amount to compensate Plaintiff for his property loss.

### (b)    Damages for Lost Wages and Benefits

Plaintiff also seeks damages for lost wages and lost 401(k) contributions in the amount of $206,000, based on his contention that the medications he was taking for pain made him fearful of making a mistake, so he retired early from his employment with Denver Water. However, there is no evidence that Plaintiff attempted to identify and try other medications that would not have interfered – or would have interfered less – with his ability

to work.  As a result, the Court cannot find that these alleged damages are recoverable under Colorado law.  First, Plaintiff's subjective belief that he could no longer work is unsubstantiated by testimony of a physician or other qualified person.  Simply stated, there is a complete lack of any expert testimony that Plaintiff was unable to work because of the accident.  Second, even assuming *arguendo* Plaintiff's inability to work in his position of Manager of Safety at Denver Water, Plaintiff had a duty to minimize his damages by seeking other work, which he failed to do.  *Banning*, 317 P.3d at 1287-88.

### (c)    Damages for Medical Expenses

The Court next considers Plaintiff's request for damages for medical care.  Although Plaintiff may recover damages for medical treatment that is reasonable and necessary, *Banning*, 317 P.3d at 1289 (citing *Lawson v. Safeway, Inc.*, 878 P.2d 127, 130-131 (Colo. App. 1994)), the evidence does not establish that rhizotomies are "reasonable and necessary" medical treatment here.  Although the Court finds that Plaintiff's desire for a relatively pain-free life is understandable, the Court nevertheless cannot conclude that such a desire is reasonable for a 56-year-old person with degenerative disc disease who was t-boned by a Postal truck. Despite Plaintiff's credible fear of rhizotomies, he chose to undergo multiple procedures in an effort to eliminate continuing pain in his neck after completing a physical therapy regimen that resulted in considerable improvement in his symptoms.  Plaintiff's apparent expectation that his post-accident pain could – and should – be entirely eliminated is simply not reasonable, under these circumstances.  Nor can the Court find that rhizotomies are necessary medical treatment in light of the evidence presented.  Although Plaintiff testified that he is pain-free for several months after each procedure, even after three rhizotomies he has not returned to his pre-accident lifestyle of

golfing, socializing and taking trips with friends. Importantly, there is no evidence that Plaintiff's self-restrictions on activities, like his decision to stop working, have been mandated by a physician. In light of Plaintiff's self-reported improvement from his physical therapy regimen, the Court finds credible Defendant's expert's opinion that Plaintiff could effectively manage his pain through the less expensive treatment Dr. Goldman outlined.

However, despite Defendant's arguments to the contrary, the Court cannot find that Plaintiff's on-going need for medical treatment is at least equally the result of his apparent fall as of the accident. In light of the lack of any meaningful evidence other than Plaintiff's own testimony regarding the nature or severity of the fall, the Court finds Dr. Goldman's testimony in this regard speculative, at best. The Court instead credits Dr. Friedrich's testimony that he was unable to provide a medical opinion about the impact of the fall on Plaintiff's condition without more thorough knowledge of the facts surrounding that incident.

### (d) TRICARE Payments

Finally, the Court addresses the impact of Plaintiff's TRICARE payments on his claim for medical expenses. Plaintiff contends that these insurance payments are a collateral source which should not be offset against any recovery he receives. *Plaintiff's Trial Brief* [#52] at 3-5. Defendant contends that evidence of Defendant's TRICARE payments is not only admissible, but must also be offset against any award to him, pursuant to Colo. Rev. Stat. § 13–21–111.6. For the reasons set forth below, the Court agrees with Defendant.

As indicated above, the relevant statute to this discussion is Colo. Rev. Stat. § 13–21–111.6 (enacted on July 1, 1986). Two distinct questions arise in this analysis, based on the two distinct clauses of the statute, which is a codification of the common law

collateral source doctrine.[2] *See Volunteers of Am. Colo. Branch v. Gardenswartz*, 242 P.3d 1080, 1082 (Colo. 2010). The question raised by the first clause is whether TRICARE is a collateral source. If it is, then the statute applies and the Court must consider its second clause. The question raised by the second clause is whether TRICARE is a matter of contract.

In order to fully address the issue, that Court explains that because TRICARE is not a collateral source under the first clause of Colo. Rev. Stat. § 13–21–111.6, the statute is inapplicable here. Hence, in accordance with well-established principles of Colorado common law, Defendant is entitled to an offset against the verdict in the amount of TRICARE payments he has received. Finally, for purposes of completeness, the Court examines the second clause of the Colorado collateral source statute and concludes that the "contract exception" set forth there also does not apply in this case.

### i.    The First Clause of Colo. Rev. Stat. § 13–21–111.6

The first question is whether TRICARE is a collateral source. If TRICARE <u>is</u> a collateral source, then Colo. Rev. Stat. § 13–21–111.6 (i.e., the codified collateral source rule) applies. If TRICARE is <u>not</u> a collateral source, then the collateral source statute simply does not apply. *See Colo. Permanente Med. Grp., P.C. v. Evans*, 926 P.2d 1218, 1232 (Colo. 1996) ("The common law collateral source rule was not applicable in situations in which a plaintiff's compensation was attributable to the defendant. There is no indication that section 13–21–111.6 changes this intent." (internal citation, quotation marks, and alterations omitted)).

---

[2] "Statutes in derogation of the common law must be strictly construed." *Gardenswartz*, 242 P.3d at 1084 (citing *Van Waters & Rogers, Inc. v. Keelan*, 840 P.2d 1070, 1076 (Colo. 1992) (stating that "if the legislature wishes to abrogate rights that would otherwise be available under the common law, it must manifest its intent either expressly or by clear implication")).

The first clause of Colo. Rev. Stat. § 13–21–111.6 provides:

In any action by any person or his legal representative to recover damages for a tort resulting in death or injury to person or property, the court, after the finder of fact has returned its verdict stating the amount of damages to be awarded, shall reduce the amount of the verdict by the amount by which such person, his estate, or his personal representative has been or will be wholly or partially indemnified or compensated for his loss by any other person, corporation, insurance company, or fund in relation to the injury, damage, or death sustained; . . . .

"The first clause partially negates the collateral source rule." *Gardenswartz*, 242 P.3d at 1084. "It directs a trial court, following a damages verdict, to adjust the plaintiff's award by deducting compensation or benefits that the plaintiff received from collateral sources (i.e., sources other than the tortfeasor)." *Id.*

"TRICARE is a managed health care program that provides civilian health benefits for military personnel and their families." *Williamson v. United States*, No. 5:12-CV-334-JMH-REW, 2015 WL 3734153, at *2 (E.D. Ky. June 15, 2015) (citing 32 C.F.R. § 199.17). "TRICARE beneficiaries other than active duty military must 'cost-share,' by paying deductibles, a percentage of remaining charges after the deductible, and enrollment fees, which resemble premiums that may be paid on a quarterly or monthly basis." *Alexander v. United States*, No. 3:14-cv-01774-RJB, 2016 WL 1733521, at *2 (W.D. Wash. May 2, 2016) (citing 32 C.F.R. §§ 199.17(m), (o)(3); 10 U.S.C. § 1097(e)). " . . . TRICARE gives beneficiaries flexibility to choose between network and non-network providers, § 199.17(m), and to enroll in either TRICARE Standard, a self-described 'HMO-like program' (TRICARE Prime) or a 'PPO program' (TRICARE Extra)." *Alexander*, 2016 WL 1733521, at *2 (citing 32 C.F.R. § 199.17(a)(ii)).

Colorado law is clear that for a source to be collateral for purposes of the first clause of Colo. Rev. Stat. § 13–21–111.6, that source must be "wholly collateral" or "wholly

independent" of the tortfeasor.  *See, e.g.*, *Wal-Mart Stores, Inc. v. Crossgrove*, 276 P.3d 562, 568 (Colo. 2012) ("A plaintiff's insurer is a collateral source because it is a third party *wholly independent* of the tortfeasor to which the tortfeasor has not contributed." (emphasis added)); *Smith v. Jeppsen*, 277 P.3d 224, 228 (Colo. 2012) ("A collateral source is a person or company, *wholly independent* of an alleged tortfeasor, that compensates an injured party for that person's injuries." (emphasis added)); *Ferrellgas, Inc. v. Yeiser*, 247 P.3d 1022, 1028 (Colo. 2011) ("The collateral source doctrine is inapplicable to bar the setoff of payments that are in some way 'attributable' to the defendant."); *Gardenswartz*, 242 P.3d at 1088 ("Our holding is consistent with the statutory contract clause and the rationale of the collateral source rule, which reject the notion that a tortfeasor may draw on sources *wholly collateral* to itself to reduce the compensation owed to the injured plaintiff." (emphasis added)).  In short, the purpose of the collateral source rule is to prevent a tortfeasor from getting credit for compensation received by an injured party from a collateral source, which would reduce the amount payable by the tortfeasor.  *Van Waters*, 840 P.2d at 1074.  Thus, TRICARE may be a collateral source in one case and not a collateral source in another case, depending on who is the asserted tortfeasor.

The Court is aware of no case from the State of Colorado or from the Tenth Circuit Court of Appeals which has decided whether TRICARE is a collateral source to the United States in an FTCA case.  Plaintiff cites to *Packard v. Emeritus Corp.*, No. 13-cv-034656, 2014 Colo. Dist. LEXIS 959 (D. Ct. Colo., Denver County, Sept. 15, 2014), for the proposition that TRICARE is a collateral source.[3]  However, the defendants in that case

---

[3]  The Court notes that Plaintiff inappropriately provided the Court with an unsigned, proposed order from *Packard* in support of his argument.  However, the Court has obtained and examined the briefs and order issued in the case in connection with the proposed order provided by Plaintiff.

were all corporations and individuals, none of whom contested that TRICARE was a collateral source. Given the parties' agreement, the court held that the plaintiff's request to exclude evidence of collateral source payments, including TRICARE, should be granted. However, *Packard* is of little value here because it offers no illumination on the key question of whether TRICARE is a collateral source in a case in which the United States is the tortfeasor.

Given that TRICARE is a cost-sharing program between the federal government and the beneficiaries of the program, and given that both TRICARE payments and FTCA payments come from the general treasury,[4] the Court is compelled to hold under Colorado law that TRICARE is not a collateral source in this case because it is not "wholly independent" of the tortfeasor, i.e. Defendant United States. Other states have held similarly. For example, in Kentucky, courts have held that TRICARE is not "wholly independent" of the United States because "both TRICARE benefits and any FTCA damages would come from the government's general unfunded treasury." *Williamson*, 2015 WL 3734153, at *2; *see also Harvey v. United States*, No. 3:09CV122-S, 2013 WL 2898785, at *1 (W.D. Ky. June 13, 2013). In Hawaii, a court held that "[a]bsent a showing that the TriCare payments come from a 'special fund that is separate and distinct from general government revenues," the United States was entitled to an offset for TRICARE payments because such payments were not collateral to the United States. *Murphy v. United States*, No. 06-00304 BMK, 2009 WL 454627, at *6 (D. Haw. Feb. 23, 2009). Similarly, a court held that Pennsylvania's collateral source rule barred a plaintiff from

---

[4] This fact distinguishes the holdings in cases like *Department of Human Services v. State Personnel Board*, 371 P.3d 748 (Colo. App. 2016), in which contributions by the beneficiary were made to a special fund, Colorado's Public Employees' Retirement Association (PERA), rather than to the general treasury.

recovering from both TRICARE and the United States Department of Veterans Affairs because that would result in "double-payment out of the general treasury." *Amesbury v. CSA, Ltd.*, No. 3:10-CV-1712, 2014 WL 279724, at *8 (M.D. Penn. Jan. 23, 2014).

Thus, because the Court finds that under Colorado law TRICARE is not a source collateral to the United States in this FTCA case, the collateral source statute, Colo. Rev. Stat. § 13–21–111.6, does not apply. *See Evans*, 926 P.2d at 1232.

### ii. Common Law Regarding Non-Collateral Source Payments

Because Colo. Rev. Stat. § 13–21–111.6 does not apply, the Court turns to the common law regarding non-collateral source payments. In *Colorado Permanente Medical Group, P.C. v. Evans*, 926 P.2d 1218, 1232 (Colo. 1996), the Colorado Supreme Court held as follows:

> The present case . . . is easily distinguished from *Van Waters*. In *Van Waters*, the defendant was not paying the disability benefits. If the award had been offset by the amount of those benefits, the defendant would have been excused from paying a portion of the award: a result that would be contrary to the policy of the collateral source statute. *Id.* at 1078. Here, Kaiser has already paid the full medical expenses as the decedent's insurer. If section 13–21–111.6 were to apply, Kaiser would be entitled to an offset against any portion of the medical expenses for which judgment would enter against the nurses. The court of appeals' application of the contract exception to deny any offset of the medical expenses that Kaiser has paid results in a double recovery for Evans. This result is also contrary to the goal of section 13–21–111.6, which is to limit double recovery. *Id.* "The [common law] collateral source rule was not applicable in situations in which a plaintiff's compensation was attributable to the defendant." *Id.* at 1074. There is no indication that section 13–21–111.6 changes this intent. . . .
>
> Our conclusion is consistent with the Tenth Circuit's opinion in [*Quinones v. Pennsylvania General Insurance Company*, 804 F.2d 1167, 1171-72 (10th Cir. 1986)[5]], where that court stated that "we are not 'excusing' [the insurer]

---

[5] "[I]n *Quinones*, the court examined a situation in which the plaintiff, injured by an uninsured motorist, filed suit against his own insurance carrier seeking damages for injuries suffered in the accident, including medical expenses already paid by the insurer under the medical pay provisions of the insurance policy. The court held that the plaintiff could not recover those

from liability when we forego the collateral source rule in this case; it has completely reimbursed [the plaintiff's] past medical expenses. Just as the rule's goal is not to reimburse plaintiffs twice, though often times that is its effect, its goal is not to charge defendants twice, either." *Quinones*, 804 F.2d at 1172. In this case, Kaiser originally paid a portion of the medical expenses and therefore should not be charged twice. . . .

Similarly, here, given that TRICARE is not a collateral source, Defendant should not be charged twice in this lawsuit. Thus, Defendant is entitled to an offset of the verdict by the amount by which Plaintiff has been indemnified/compensated by TRICARE.

### iii.    The Second Clause of Colo. Rev. Stat. § 13–21–111.6

Even if, *arguendo*, TRICARE is a collateral source and the collateral source statute rather than the common law rule applies, Plaintiff's argument still fails. The second clause of Colo. Rev. Stat. § 13–21–111.6 provides:

. . . except that the verdict shall not be reduced by the amount by which such person, his estate, or his personal representative has been or will be wholly or partially indemnified or compensated by a benefit paid as a result of a contract entered into and paid for by or on behalf of such person.

"The second clause, described as the 'contract exception' or the 'contract clause,' retains the collateral source rule for certain benefits." *Gardenswartz*, 242 P.3d at 1084. "No offset is permitted if the benefits arise out of a contract entered into on the plaintiff's behalf." *Id.* Private insurance, private disability benefits, Social Security disability benefits,[6] Colorado's Public Employees' Retirement Association ("PERA") retirement benefits, and Medicaid

_____

expenses which the insurer had already paid under the policy because the insurer was both a defendant and a collateral source." *Evans*, 926 P.2d at 1231.

    [6] In *Barnett v. American Family Mutual Insurance Company*, 843 P.2d 1302 (Colo. 1993), the Social Security benefits at issue were clearly a collateral source with respect to the alleged tortfeasor, a private insurance company, so the only issue was whether the contract exception applied.

benefits[7] "all fall within the contract exception to the collateral source statute." *Pressey by and through Pressey v. Children's Hosp. Colo.*, __ P.3d__, __, No. 15CA1372, 2017 WL 929931, at *3 (Colo. App. Mar. 9, 2017).[8] For example, Medicaid benefits fall within the exception because "Medicaid benefits are paid on behalf of [the plaintiff], and she was required to enter into a written Medicaid application agreement to repay the state for any Medicaid benefits she receives for which she would not qualify under the federal guidelines." *Id.* "Under section 13–21–111.6, these benefits are dependent upon 'a contract entered into . . . by or on behalf of' [the plaintiff] for which she remains financially responsible." *Id.*

The Court is aware of no case from the State of Colorado or from the Tenth Circuit Court of Appeals which has decided whether TRICARE benefits fall within the contract exception to the collateral source statute. However, the Court is persuaded that they do not, based on the following in-depth discussion of benefits for retired military personnel—including TRICARE—provided in *Schism v. United States*, 316 F.3d 1259, 1268-75 (Fed. Cir. 2002):

> Benefits for retired military personnel—and for civilian retired federal employees, for that matter—depend upon an exercise of legislative grace, not upon principles of contract, property, or "takings" law. *See Zucker v. United States*, 758 F.2d 637, 640 (Fed. Cir.1985) (explaining that federal workers' "entitlement to retirement benefits must be determined by reference

---

[7] Similar to *Barnett*, the Medicaid benefits at issue in *Pressey* were clearly a collateral source with respect to the alleged tortfeasor, a hospital, so the only issue was whether the contract exception applied.

[8] The Court notes that *Pressey* cited to *Department of Human Services v. State Personnel Board*, 371 P.3d 748 (Colo. App. 2016), for the proposition that PERA retirement benefits fall within the contract exception to the collateral source statute. *Pressey*, 2017 WL 929931, at *3. However, it is not clear that the contract exception to the collateral source statute was the basis of the Colorado Court of Appeals' decision that PERA benefits constitute a collateral source not required to be offset from a damages award.

to the statute[s] and regulations governing these benefits, rather than to ordinary contract principles"); *see also Bell v. United States*, 366 U.S. 393, 401 (1961) ("A soldier's entitlement to pay is dependent upon statutory right."); *Kania v. United States*, 227 Ct. Cl. 458, 650 F.2d 264, 267-68 (1981) ("Thus it has long been held that the rights of civilian and military public employees against the government do not turn on contract doctrines but are matters of legal status even where compacts are made."); *Shaw v. United States*, 226 Ct. Cl. 240, 640 F.2d 1254, 1260 (1981) (stating "the law is well settled that, 'public employment does not, . . . give rise to a contractual relationship in the conventional sense'") (citations omitted). In other words, Congress—and only Congress—can authorize the benefits that a retired federal employee, whether civilian or military, is entitled to receive. *See Frisbie v. United States*, 157 U.S. 160, 166 (1895) ("Pensions are the bounties of the government, which [C]ongress has the right to give, withhold, distribute, or recall at its discretion. Congress, being at liberty to give or withhold pensions, may prescribe who shall receive, and determine all the circumstances and conditions under which any application therefore shall be prosecuted. No man has a legal right to a pension . . . . The whole control of that matter is within the domain of congressional power." (citations omitted)). . . .

CHAMPUS guaranteed retirees who were not yet entitled to Medicare benefits access to authorized health services from civilian sources as an alternative to care from military facilities. Military Compensation Background Papers, at 609–10. Of significance is that CHAMPUS was not a "free" program:

> By law, CHAMPUS is a cost-sharing program with the retiree responsible, in the case of outpatient services, for a deductible [which increases over time] . . . together with [a percentage] of all allowed charges for "inpatient care." The Government pays the balance of the allowed charges for authorized care, i.e., 75 percent of the allowed charges, provided that a retiree or a retiree's family group of two or more persons may not be required to pay a total of [an amount which increases over time] for health care received under CHAMPUS during any fiscal year.

10 U.S.C. § 1086(b)(4).

*Id.* (footnote omitted). Thus, because the very program Congress enacted in part for the retirees' benefit was never "free," it is clear that Congress never intended health care for retired career personnel to be without cost to the retirees.

Following yet another examination of health care for retirees, in 1986,

Congress enacted 10 U.S.C. §§ 1097, 1099 to further improve the health care system for service members. This legislation provided the authority for the military's eventual implementation of TRICARE in the early 1990s, which offered CHAMPUS-eligible beneficiaries (retirees under 65 years of age) a choice among a health maintenance organization-type program, a preferred provider network program, and CHAMPUS benefits. *See* 10 U.S.C. §§ 1097, 1099 (1986). In order to stimulate enrollment in TRICARE Prime, Congress amended section 1097 in 1996, to provide that "the Secretary shall, as an incentive for enrollment, establish reasonable preferences for services in facilities of the uniformed services for covered beneficiaries enrolled in any program established under, or operating in connection with, any contract under this section." 10 U.S.C. § 1097(c) (Supp. II 1996). Because TRICARE Prime was limited to CHAMPUS-eligible beneficiaries, the priority access requirement had the effect of reducing space-available care for Medicare-eligible (65 years and over) retirees and their dependents. Congress then took steps to ameliorate this effect. For example, in 1997, it enacted the "Medicare subvention demonstration project for military retirees," which provided for Medicare funding of a Department of Defense-sponsored program similar to TRICARE Prime. See 42 U.S.C. § 1395ggg (Supp. III 1994). Then, in 1998, Congress acted again, adopting demonstration projects for Medicare-eligible Department of Defense beneficiaries. *See* National Defense Authorization Act for Fiscal Year 1999, Pub.L. No. 105–261, §§ 721–723. These projects were the Federal Employees Health Benefits Program Demonstration Project; TRICARE as a Supplement to Medicare; and the Pharmacy Redesign Implementation. Most recently, of course, Congress exercised its authority over health care for retired military members by introducing TRICARE For Life, which provides a pharmacy services program for Medicare-eligible beneficiaries and authorizes Medicare-eligible beneficiaries who enroll in Medicare Part B to participate in CHAMPUS. *See* Pub.L. No. 106–398, § 712 (2000). . . .

The Supreme Court has recognized the irrelevance of contract law for members of the military many times, stating, for example, that "common-law rules governing private contracts have no place in the area of military pay." *Bell v. United States*, 366 U.S. 393, 401 (1961). . . . [E]ven if one were to consider the asserted medical benefit entitlement more as bargained-for, direct compensation for services rendered rather than gratuities, because the plaintiffs are military personnel, the vesting of any rights would be governed by statute, rather than by contract . . .

> [Federal employees'] entitlement to retirement benefits must be determined by reference to the statute and regulations governing these benefits, rather than to ordinary contract principles. [And] [a]pplying th[is] doctrine ... courts have consistently refused to give effect to government-fostered expectations that, had they arisen in the private sector, might

well have formed the basis for a contract or an estoppel.

*Zucker v. United States*, 758 F.2d 637, 640 (Fed. Cir.1985). . . .

In addition, Congress could hardly have intended a contract regime for military health benefits because that would have been inconsistent with the entire system for compensating all federal employees. Federal employees, both military and civilian, serve by appointment, not contract, and their rights to compensation are a matter of "legal status" even where recruitment agreements are made. *See Zucker*, 758 F.2d at 640; *see also Chu v. United States*, 773 F.2d 1226, 1227-28 (Fed. Cir.1985) (discussing the plight of Reserve Officers in the Commissioned Corps of the Public Health Service who alleged a breach of contract by the government of its agreement to provide residency training at its expense and stating "[it is a] well-established principle that, absent specific legislation, federal employees derive the benefits and emoluments of their positions from appointment rather than from any contractual or quasi-contractual relationship with the government"). "In other words, [federal employees'] entitlement to retirement benefits must be determined by reference to the statute and regulations governing these benefits rather than to ordinary contract principles." *Zucker*, 758 F.2d at 640. This logically follows from the well-established principle that

> "public employment does not, . . . give rise to a contractual relationship in the conventional sense." Therefore, plaintiff may not base his theory of recovery on contract law since he was a federal employee. Federal officials who by act or word generate expectations in the persons they employ, and then disappoint them, do not ipso facto create a contract liability running from the Federal Government to the employee, as they might if the employer were not the government.

*Shaw v. United States*, 226 Ct.Cl. 240, 640 F.2d 1254, 1260 (1981) (citations omitted).

Adhering to our own long-standing precedent and clear guidance from Supreme Court decisions, then, the plaintiffs' claim for breach of an implied-in-fact contract for retirement health benefits is defeated by the principle that statutes govern entitlement to these benefits, not any contracts between the recruit and the government.

Based on the foregoing discussion by the Federal Circuit Court of Appeals, the Court finds that TRICARE benefits materially differ from private insurance, private disability benefits, Social Security disability benefits, PERA retirement benefits, and Medicaid

benefits, all of which have been found to fall within the contract exception to the collateral source doctrine under Colorado law. As noted previously, "[s]tatutes in derogation of the common law must be strictly construed." *Gardenswartz*, 242 P.3d at 1084. Colo. Rev. Stat. § 13–21–111.6 refers to "a benefit paid as a result of a contract." No mention is made of benefits obtained purely as a result of legislation or regulation. Given the total "irrelevance of contract law" to benefits such as TRICARE for federal employees, *see Schism*, 315 F.3d at 1271, the Court cannot find that the contract exception of Colo. Rev. Stat. § 13–21–111.6 applies here.

Accordingly, the United States is entitled to an offset on the verdict in this case, in the amount of TRICARE benefits paid to Plaintiff in connection with his medical treatment after the accident at issue.

### 2.    Non-economic Losses

Plaintiff seeks damages for emotional and physical pain, more specifically described as his on-going right and left-sided neck pain, headaches, and emotional pain from the loss of meaningful activities like golf, biking and socializing, which negatively impacts his quality of life. He also seeks damages for past and future inconvenience and emotional distress, including his on-going need to take medications and endure their side effects, his need to accommodate chronic pain, and the emotional distress of knowing that he will never be "back to normal."

The Court must consider the totality of the circumstances when assessing Plaintiff's entitlement to damages. First, although there is no doubt that Plaintiff suffered injuries in the accident and that he will continue to experience some pain as a result, the Court notes that it is also undisputed that Plaintiff had pre-existing conditions, degenerative disc disease

and a shoulder injury, which also contribute to his pain as well as limitations on his lifestyle. Second, the Court notes that the human aging process is rarely pain-free, and Plaintiff was 56-years-old at the time of the accident. Third, as noted above, the restrictions on Plaintiff's work and leisure activities appear to be entirely self-imposed. According to Dr. Goldman, if Plaintiff were to undergo his course of recommended treatment and obtain modified golf clubs and a modified bicycle, he could more likely than not return to those activities within one to three months. Plaintiff testified that he worked up to sixty hours a week for three and one-half years after the accident, which is plainly inconsistent with his severely-restricted current lifestyle. Considering the effect of the accident on Plaintiff in light of the testimony presented, the Court finds that an award of $50,000 for non-economic losses is just and reasonable.

### 3.    Damages for Physical Impairment

The evidence regarding the extent of Plaintiff's physical impairment as a result of the accident was disputed by the parties. Although Plaintiff testified about the permanent limitations on his ability to look upward and turn his head as well as his difficulty reaching his arms out and overhead, Dr. Goldman opined that Plaintiff has only a mild residual impairment as a result of the accident. It is clear that Plaintiff's pre-existing shoulder problem contributes to his difficulties in reaching to an unknown degree. In addition, there is a lack of conclusive evidence that Plaintiff's right-sided neck pain is wholly attributable to the accident, as it began to occur approximately one year later. In light of the evidence presented, the Court finds that an award of $25,000 for physical impairment is just and reasonable.

### III.  Conclusion

IT IS HEREBY **ORDERED** that Plaintiff is entitled to an award against Defendant as follows:

(A)     Property loss of $7,059.98; and

(B)     Non-economic losses of $50,000; and

(C)     Physical impairment damages of $25,000; and

(D)     Past medical expenses for the period of January 1, 2014 through August 19, 2014, plus $8,500 per year thereafter in accordance with Defendant's expert testimony for a total of $199,750 for future medical expenses, given Plaintiff's life expectancy of 23.5 years after August of 2014;[9] <u>LESS</u>

(E)     The amount of any TRICARE payments made to Plaintiff for medical care and treatment of injuries sustained in the accident, to date.

IT IS FURTHER **ORDERED** that on or before **December 10, 2018,** the parties shall file a stipulation as to the amounts of: (1) Plaintiff's medical expenses incurred from the date of the accident to August 19, 2014; and (2) TRICARE payments to Plaintiff to date. Final judgment shall be entered by the Court thereafter.

Dated:  November 26, 2018

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge

---

[9]  Table 8 of National Vital Statistics reports, Vol. 66, No. 3, April 11, 2017, self-authenticated under Fed. R. Evid. 902. *Plaintiff's Trial Brief* [#52] at 5.