IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02756-KLM

WARREN CRAIG AUSTIN,

　　Plaintiff,

v.

UNITED STATES OF AMERICA,

　　Defendant.
_____

**ORDER**
_____

This matter is before the Court on Defendant's **Motion to Amend Findings of Fact, Conclusions of Law and Order (ECF No. 74)** [#82][1] (the "Motion"). Plaintiff filed a Response in opposition to the Motion [#88], and Defendant filed a Reply [#89]. The Court has reviewed the Motion, the Response, the Reply, the entire case file, and the applicable law, and is sufficiently advised in the premises. For the reasons set forth below, the Motion [#82] is **GRANTED**, as follows.[2]

Plaintiff was injured on January 11, 2014, in Lakewood, Colorado, when a United States Postal Service delivery vehicle collided with the car he was driving. Plaintiff brought suit for damages under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, and 2680.

---

[1] "[#82]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

[2] Pursuant to 28 U.S.C. § 636(c), the matter has been referred to the undersigned for all purposes, including trial and final judgment. See [#15, #16].

1

*Compl.* [#1] ¶ 3. Defendant did not contest liability for the accident but did contest damages. *See* [#74] at 1. The case came before the Court for a bench trial on June 18-20, 2018. At the conclusion of trial, the Court took the matter under advisement and subsequently issued Findings of Fact, Conclusions of Law and Order [#74]. In the present Motion [#82], Defendant seeks amendment of a finding of fact and a portion of the order stemming from that finding of fact pursuant to Fed. R. Civ. P. 52(b).[3]

Specifically, Defendant takes issue with the last word of this sentence: "Dr. Goldman estimated the cost of his recommended treatment regimen at $7,500 to $8,500 annually." *Motion* [#82] at 7. Defendant argues that the Court misconstrued Dr. Goldman's testimony and that $8,500 was "the *total* cost of Plaintiff's plan of care, rather than an amount to be paid annually over Plaintiff's remaining life expectancy." *Id.* at 1 (emphasis in original). Defendant primarily relies on the following evidence in support of its argument:

(1)  Question to and answer by Dr. Goldman: "Q. And what was the cost you estimated for your plan? A. $8,500." *Trial Transcript* [#82-1] at 61.

(2)  THE COURT: The question I would like you to answer, Dr. Goldman, as indicated, is what would the regiment -- if you were providing the regiment you suggested to Mr. Austin, what would it cost, based on your costs you would bill.

THE WITNESS: It would be -- would be a little less than that, actually, because we bill in the 95th plus or minus 3 percent of usual and customary ranges. So I estimated those based on up to 98 percent, not the highest 2 percent. So, transparency, that is what I am considering usual and customary. I am taking like a 98 percentile bell curve, not the last 2 percent. My cost would be a bit less.

---

[3] Fed. R. Civ. P. 52(b) provides, in relevant part: "On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly."

THE COURT: What is the dollar amount?

THE WITNESS: If this was being done with the therapist and people I work with, it would probably [be] closer to [$]7,500 to $8,000 range.

Id. at 62-63.

(3) Q. (BY MR. PESTAL) So, Dr. Goldman, to recap that, if Mr. Austin had $8,500 in his pocket, could he go out and implement your plan in the marketplace, without relying on insurance, without relying on any other source of healthcare?

A. With the people I work with, yes, he can negotiate that, and also have some spare change. They would be glad to take the cash.

Id. at 63.

(4) Dr. Goldman testified:

But I think [Plaintiff] would get back to that baseline. Usually most of my patients actually get better, if they stay with the program, they upgrade it every 3 months to every year, typically will get better for another 2 to even 5 years, very slowly, very slowly. We are not talking about gang busters, but it takes that long for the body to re-sculpture the muscles.

Id. at 52.

(5) Q. (BY MR. PESTAL) What is the typical number or time interval over which those are recommended? Is it, you know, once every year, or is it indefinite, or what is your –

A. The protocol outlined -- and I checked on this, and it is pretty consistent with what has been published, is 70 to 80 percent of the folks, they need the one round of trigger point injections if they are done with the protocol I am suggesting.… But doing it the way I was taught, and the teachings, and consistent with the guidelines I have been part of creating, 70 to 80 percent of the folks don't need it repeated if you add on the exercise.

Id. at 77.

(6) Dr. Goldman testified:

About 20 percent need the injection repeated the following year or 6 months later. 5 to 10 percent have them repeated every few years, but always with some therapy tune-up. Most of the folks I take care of, if they haven't completely obliterated the myofascial pain, or substantially, again, I usually

3

move them into acupuncture, which is less costly and less painful, less invasive. But, I've had -- actually, I had one patient from the Denver Water Company -- maybe Mr. Austin knows who he is -- who actually would come back to me for shoulder and trigger point injections like every 2 or 3 or 4 years for 15 years or so, but he was unusual. So there is an exception to every rule. But it is not the type of thing you have people coming back and getting an injection all of the time.

*Id.* at 78.

Based on this evidence, Defendant argues that "[t]he $8,500 amount was for the entirety of Dr. Goldman's treatment plan" and that "Dr. Goldman did not testify that Plaintiff would require these treatments—or $8,500—every year, for the rest of his life." *Motion* [#82] at 4.

Plaintiff, on the other hand, contends that "the Court's order in this regard is fully supported by the evidence, including the testimony of Dr. Goldman." *Response* [#88] at 1. In part, Plaintiff specifically directs the Court's attention to the following additional evidence:

(1) Dr. Goldman testified that the recovery process is slower and incomplete for older patients. *See* [#82-1].

(2) Dr. Goldman testified that Plaintiff may require up to four sets of trigger point injections three times per week for up to four weeks. *Id.* at 60.

(3) Plaintiff testified that, even with treatment, his neck pain and other symptoms persist, although he does get temporary relief from certain treatments. *See* [#88-1] at 34-35, 45-83, 109-10.

(4) As of May 30, 2018, the date on which Plaintiff was scheduled to have his next rhizotomies, Plaintiff was still having neck pain and other symptoms, so he proceeded with the rhizotomies. *See id.* at 88.

4

(5) Dr. Friedrich testified that Plaintiff has chronic symptoms and requires ongoing treatment. *See* [#68] at 98-100.

Thus, Plaintiff asserts that the evidence supports the Court's award of $8,500 to Plaintiff on an annual basis rather than on a one-time basis. *Response* [#88] at 1.

"A motion made pursuant to Rule 52(b) will only be granted when the moving party can show either manifest errors of law or fact, or newly discovered evidence; it is not an opportunity for parties to relitigate old issues or to advance new theories." *Blann v. Rogers*, No. 11-2711-CM, 2014 WL 6895592, at *1 (D. Kan. Dec. 5, 2014); *see also Lyons v. Jefferson Bank & Tr.*, 793 F. Supp. 989, 992 (D. Colo. 1992) (denying a Rule 52(b) motion where the movant showed no manifest error of law or fact). The purpose behind Fed. R. Civ. P. 52(b) is "to correct manifest errors of law or fact or, in some limited situations, to present newly discovered evidence." *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1219 (5th Cir. 1986). However, Rule 52(b) should not be used "to introduce evidence that was available at trial but was not proffered, to relitigate old issues, to advance new theories, or to secure a rehearing on the merits." *Id.* The Court has "considerable latitude" when ruling on a Rule 52(b) motion, and the decision to grant or to deny the motion is within the Court's "sound discretion." *Matthews v. C.E.C. Indus. Corp.*, 202 F.3d 282 (table), 1999 WL 1244491, at *7 (10th Cir. 1999).

As the Court noted in its Findings of Fact, Conclusions of Law and Order [#74], Plaintiff must prove his entitlement to damages by a preponderance of the evidence. Colo. Rev. Stat. § 13–25–127 (West); *Nelson v. United States,* No. 11-cv-02953-WYD-MEH, 2014 WL 1929585, at *13-14 (D. Colo. May 14, 2014). Plaintiff "may not recover damages for injuries that might reasonably have been avoided," because he has the duty to take

reasonable steps under the circumstances to mitigate the damages he sustained. *Banning v. Prester*, 317 P.3d 1284, 1287-88 (Colo. App. 2012) (citing *Harsh v. Cure Feeders, LLC*, 116 P.3d 1286, 1288 (Colo. App. 2005)). Plaintiff may only recover damages for medical treatment that is reasonable and necessary. *See Banning*, 317 P.3d at 1289 (citing *Lawson v. Safeway, Inc.*, 878 P.2d 127, 130-131 (Colo. App. 1994)).

In connection with medical expenses, the Court previously found:

> [T]he evidence does not establish that rhizotomies are "reasonable and necessary" medical treatment here. Although the Court finds that Plaintiff's desire for a relatively pain-free life is understandable, the Court nevertheless cannot conclude that such a desire is reasonable for a 56-year-old person with degenerative disc disease who was t-boned by a Postal truck. Despite Plaintiff's credible fear of rhizotomies, he chose to undergo multiple procedures in an effort to eliminate continuing pain in his neck after completing a physical therapy regimen that resulted in considerable improvement in his symptoms. Plaintiff's apparent expectation that his post-accident pain could – and should – be entirely eliminated is simply not reasonable, under these circumstances. Nor can the Court find that rhizotomies are necessary medical treatment in light of the evidence presented. Although Plaintiff testified that he is pain-free for several months after each procedure, even after three rhizotomies he has not returned to his pre-accident lifestyle of golfing, socializing and taking trips with friends. Importantly, there is no evidence that Plaintiff's self-restrictions on activities, like his decision to stop working, have been mandated by a physician. In light of Plaintiff's self-reported improvement from his physical therapy regimen, the Court finds credible Defendant's expert's opinion that Plaintiff could effectively manage his pain through the less expensive treatment Dr. Goldman outlined.
>
> However, despite Defendant's arguments to the contrary, the Court cannot find that Plaintiff's on-going need for medical treatment is at least equally the result of his apparent fall as of the accident. In light of the lack of any meaningful evidence other than Plaintiff's own testimony regarding the nature or severity of the fall, the Court finds Dr. Goldman's testimony in this regard speculative, at best. The Court instead credits Dr. Friedrich's testimony that he was unable to provide a medical opinion about the impact of the fall on Plaintiff's condition without more thorough knowledge of the facts surrounding that incident.

*Findings of Fact, Conclusions of Law and Order* [#74] at 8-9.

The Court has thoroughly reviewed the trial transcript, with special attention paid to the portions of the record cited by the parties. Based on this review, the Court finds that the Motion [#82] should be granted. Dr. Goldman did not directly testify, or even clearly imply, that his $8,500 estimation was an annual estimation of medical costs that Plaintiff would need to incur. Given the evidence before the Court, the Court finds that the preponderance of the evidence supports a finding that Plaintiff is entitled to only a one-time award of $8,500 and *not* to $8,500 per year after August 19, 2014, for the duration of Plaintiff's life expectancy.

The parties have also provided a Stipulation [#87] as to certain medical expenses and Tricare payments made to Plaintiff. Based on the Stipulation [#87] and the foregoing discussion,

IT IS HEREBY **ORDERED** that the Motion [#82] is **GRANTED**.

IT IS FURTHER **ORDERED** that the Findings of Fact, Conclusions of Law and Order [#74] is amended as follows:

(1) Plaintiff is entitled to a one-time award of $8,500 and *not* to $8,500 per year after August 19, 2014, for the duration of Plaintiff's life expectancy.

(2) Plaintiff is entitled to an award against Defendant as follows:

(A) Property loss of $7,059.98; and

(B) Non-economic losses of $50,000; and

(C) Physical impairment damages of $25,000; and

(D) Medical expenses of $18,280.87.[4]

---

[4] This amount consists of $11,191.78 (the cost of Plaintiff's medical treatment related to the January 11, 2014 collision between January 11, 2014, and August 19, 2014) minus $1,410.91 (the

IT IS FURTHER **ORDERED** that the Clerk of Court shall **enter** Final Judgment in the amount listed above and shall then **close** this case.

Dated: April 24, 2019

BY THE COURT:

*[signature]*

Kristen L. Mix
United States Magistrate Judge

---

amount Tricare paid for Plaintiff's collision-related medical treatment rendered between January 11, 2014, and August 19, 2014), plus $8,500 for future medical care. *Stipulation* [#87] ¶¶ 1-2. The parties agree that "[t]o the extent the Court awards Plaintiff $8,500 for future medical care only, Plaintiff is correct that there would be no need to include a Tricare offset." *Reply* [#89] at 3 n.1 (citing *Response* [#88] at 10 n.4). Because Plaintiff is not awarded medical expenses for care received between August 29, 2014, and October 10, 2018, there is no need to offset the award with the amount of Tricare payments made for that time, i.e., $13,287.06. *See Reply* [#89] at 3 n.1; *Stipulation* [#87] ¶ 3.

The Court also notes that the parties stipulate that "the total amount paid by Tricare for Plaintiff's collision-related medical treatment through October 10, 2018, is $14,697.97. However, Tricare has received medical payments coverage in the amount of $1,341.00 from Plaintiff's automobile insurance carrier (USAA) as partial reimbursement. Accordingly, the net amount paid by Tricare for Plaintiff's collision-related medical treatment through October 10, 2018, is $13,356.97." There is no indication, though, as to how much, if any, of the $1,341.00 paid by USAA affects the net amount of the Tricare offset for the period between January 11, 2014, and August 19, 2014. To the extent the USAA payments affect this period, the parties may file a motion to amend the final judgment pursuant to the Federal Rules of Civil Procedure.